SMART v. MURPHY.

4-5879 139 S. W. 2d 33

Opinion delivered April 15, 1940.

 

*C. M. Martin* and *Ezra Garner,* for appellant.

*McKay, McKay & Anderson,* for appellee.

MEHAFFY, J. This action was instituted by appellees in the circuit court of Columbia county on the 18th day of May, 1938. They alleged that they were the owners of the following described lands situated in Columbia county, Arkansas: "The SE¼, section 14, township 15 south, range 20 west."

They sought to have canceled and set aside as clouds upon their title, certain oil and gas leases executed in April, 1938, by appellants to Byron H. Schaff, and prayed that their title to the lands in controversy be quieted and confirmed.

Appellees claim title to said lands under and by virtue of the terms of the last will and testament of W. H. Murphy, who died testate on November 8, 1932, in Columbia county, Arkansas. Appellee, Mattie Murphy, is the widow of the said W. H. Murphy and appellees Lessie Murphy and Lillie Mae Murphy and Vera Murphy are his children.

The will of said W. H. Murphy was duly probated and recorded on December 12, 1932.

There was an unrecorded deed to the lands in controversy executed by Mattie A. Murphy, appellee, to W. H. Murphy. She was, at the time of the execution of the deed, the wife of W. H. Murphy. Mattie A. Murphy first married William T. Smart, who died shortly after their marriage, and the probate court of Columbia county, Arkansas, made an order vesting title to said lands in Mattie A. Murphy. It was shown that the estate was worth less than $300, and she was the widow of W. T. Smart. Smart acquired title by deed from Matt H. Roberts and Virginia Roberts, his wife. Appellees also claim title to the lands by adverse possession.

The appellants filed answers and cross-complaints. There were certain exhibits attached to the pleadings.

On January 24, 1938, this cause was transferred to the second division of the Columbia chancery court, and was tried on June 5, 1939, and the chancellor rendered a decree in favor of appellees. The case is here on appeal.

The evidence in this case shows that Mattie A. Murphy's first husband was William T. Smart, and that he acquired the land in controversy about 1875 by deed and owned the land in fee simple; that he married mattie A. Murphy in the year 1877 and they lived together for six weeks, when he was accidentally killed; that this land was his homestead at the time of his death. They had one child born in 1877, which was after the death of the father. Said child lived something less than two years. After W. T. Smart's death, there was administration on his estate and Mattie A. Murphy filed a petition in probate court of Columbia county stating that the estate was less than $300 in value and asked that it be vested in her in fee simple. The probate court made an order vesting the title in Mattie A. Murphy. This order, of course, was void because the probate court had no authority to vest the title in the widow, but she thought it was a valid order, and thought she was the owner in fee simple of the land in controversy. The widow of Smart, about three and a half years after he died, married W. H. Murphy.

Mattie A. Murphy not only thought that the order was valid, and that she had title to the land, but under the undisputed evidence in the case she continued to live on the land as her homestead, until she married W. H. Murphy, and after her marriage she executed and delivered to Murphy a deed to this land, attempting to convey a fee simple title. This was in 1882. Immediately after she had conveyed the land to Murphy, he took possession under the deed, placed said deed in his trunk with other papers without recording it, and this deed was destroyed by fire in 1919. Murphy and his wife did not live on this land, but he took possession under the

deed from his wife, claimed to own it, paid the taxes beginning in 1883 until the time of his death. The evidence shows that the deed was seen by witnesses in his trunk with other papers. Mr. Murphy not only took possession, but began the cultivation of the land and held it in open, hostile, notorious, and peaceable possession until 1932, fifty years. During this time Murphy cleared land and cultivated it, sold timber, and executed mineral leases, and received pay for the timber and leases, receiving at one time $8,000. The evidence shows that the appellants all lived in the community and of course knew of Murphy's claim, knew that he exercised ownership, knew that he cleared and cultivated the land, and that he paid the taxes on it. There is no evidence that any of them ever made any objection to his ownership of the land or his acts in selling the minerals or timber, and no suggestion was ever made by any of the appellants that he was not entitled to the property. He, therefore, held this land in open, peaceable, hostile and adverse possession, and exercised full control without any interruption, and there was no interruption after his death. The evidence shows that he made a will giving this property to his widow for life and in fee simple to his children. This will was probated in 1935.

We think the evidence abundantly shows that the appellants had notice of his acts and notice of the public records.

When Mrs. Murphy conveyed the property to Mr. Murphy and moved with him to another home, she abandoned her homestead and dower interest in the land, and the collateral heirs could at that time have taken possession.

The testimony of B. A. Warren shows that he was in the abstract business, and that he had searched the records of Columbia county as to the payment of taxes on these lands, and introduced a statement showing that the taxes had been paid by Murphy, and Mrs. Murphy after his death, from 1883 until 1932.

The appellants contend that the probate court had no power to make an order vesting the homestead in

the widow, and they cite numerous authorities. With this contention we agree.

They also say that if an estate is ancestral and comes to the intestate by gift, devise or descent on the part of the father or mother, it passes to the heirs of the intestate who are of the blood of the ancestor from which it comes. We think the authorities are in harmony on this proposition, and that appellee's rights are derived wholly from adverse possession.

"Adverse possession is one of the modes of acquiring title to property. It has been defined as the open and notorious possession and occupation of real property under an evident claim or color of right. It is said to be a possession in opposition to the true title and real owner,—a possession which is commenced in wrong and is maintained in right. Again, it has been defined as the ripening of adverse possession into title by lapse of time. A title acquired by adverse possession is a title in fee simple, and is as perfect a title as one by deed from the original owner or by patent or grant from the government." 1 Am. Jur. 793.

"In a steadily increasing number of jurisdictions, the possession is the important element, and it is held that such possession is not the less adverse because the person takes possession of the land in question innocently and through mistake. In other words, it is visible and adverse possession, with an intention to possess land occupied under a belief that it is the possessor's own, that constitutes its adverse character, and not the remote view or belief of the possessor." 1 Am. Jur., 918.

This court recently said: "In order that adverse possession may ripen into ownership, possession for seven years must have been actual, open, notorious, continuous, hostile, exclusive, and it must be accompanied with an intent to hold against the true owner." *Terral v. Brooks,* 194 Ark. 311, 108 S. W. 489.

In the instant case the appellees have had possession for fifty years, and have been in the actual, open, notorious, continuous, hostile, and exclusive possession of the land, and the acts of ownership are such that the appel-

lants must have known of the occupancy and claim of appellees. Mattie A. Murphy's conveyance was an abandonment of her right and interest and entitled the appellants to enter at once.

The statute of limitations, therefore, commenced to run after her abandonment. The law with reference to adverse possession is well settled in this state, and the only question in this case is, does the evidence show adverse possession?

The chancellor found that the evidence did show adverse possession. His finding is supported by a preponderance of the evidence, and the decree is affirmed.