Max ROE, Dan Roe, Otho Roe and Marie Roe *v.* Fred W. DIETRICH, Jr., Ralph Goza, and Ben B. Floyd, Trustee

92-56                                             835 S.W.2d 289

Supreme Court of Arkansas
Opinion delivered June 29, 1992

56

*Shackleford, Shackleford & Phillips, P.A.*, by: *Teresa Wineland*, for appellants.

*Bramblett & Pratt*, by: *Eugene D. Bramblett* and *Roberts, Harrell, & Lindsey*, by: *Paul E. Lindsey* and *Ralph C. Goza*, for appellees.

JACK HOLT, JR., Chief Justice. This appeal involves a chancellor's findings of preferential transfer of real property and the execution of a partnership dissolution agreement by the appellants for the alleged purpose of defrauding the appellees as judgment creditors.

Appellee Ralph Goza was a general partner with appellants, Max Roe and Dan Roe, in an entity called Buena Vista Farms. Appellee Dr. Fred Dietrich was a limited partner. Mr. Goza filed an action in the Ouachita County Chancery Court to dissolve and wind up the partnership and to equalize the capital accounts. Following a hearing before Judge Jim Gunter, a chancellor serving by special assignment, judgments were entered in favor of Mr. Goza and Dr. Dietrich and against Max Roe and Dan Roe.

On the day of the hearing, April 26, 1990, Mx and Dan Roe executed a warranty deed conveying to their parents, Otho and Marie Roe, 260 acres of timberland which Max and Dan owned under another partnership known as MDR Enterprises. On July 6, 1990, Max Roe paid the judgment entered against him. Dan

Roe's judgment remained unsatisfied.

On July 12, 1990, Dr. Deitrich and Mr. Goza, in a subsequent and separate lawsuit, filed a petition to set aside the deed to Mr. and Mrs. Roe as a fraudulent conveyance. A month later, Max and Dan Roe entered into an agreement to dissolve the MDR Enterprises partnership in the event the petition to set aside the warranty deed was upheld. Under the terms of the agreement, 35 acres of the real property and 13.72% of the capital assets were set aside for Dan Roe and 225 acres and 86.28% of the capital assets for Max Roe. Eight days later, Dan Roe filed for bankruptcy and appellee Ben Floyd was appointed to serve as trustee representing the creditors.

The appellees later amended their petition to set aside not only the warranty deed but also the agreement to dissolve partnership, as preferential transfers and fraudulent conveyances. Judge Jim Gunter was again assigned to hear the further dispute between the parties. Pretrial motions by the appellants to continue the trial and to disqualify Judge Gunter were denied.

Following trial, the chancellor set aside both the conveyance to Otho and Marie Roe and the dissolution agreement. The trial court found that Dan Roe held two-thirds of the real estate property and Max Roe one-third and that their partnership capital accounts in MDR were equal.

On appeal, the appellants assert the trial court erred 1) in denying their motion for continuance; 2) in denying their motion for disqualification; 3) in deciding the respective interests of Max Roe and Dan Roe in MDR Enterprises and in failing to dismiss Max Roe as a defendant; and 4) in determining the capital account balances and ownership of the partnership property. We disagree with all four arguments and affirm.

## I. CONTINUANCE

The appellants first argue the trial court abused its discretion by refusing to grant a continuance because Max Roe was unavailable for trial. They contend Max's testimony was crucial to a determination of the capital contributions to the MDR partnership.

We have held such a denial will not be reversed until the

trial court abused its discretion in doing so by acting arbitrarily and capriciously. *Smith* v. *City of Little Rock*, 279 Ark. 4, 648 S.W.2d 454 (1983).

The parties were notified by letter dated July 25, 1991, that trial was scheduled for September 26, 1991. The appellants claim that in August, Max Roe, who had apparently been unemployed, was offered a temporary job as environmental and safety engineer on a pipeline construction job in Connecticut. The appellants moved for a continuance on September 18, stating that due to the critical nature of Mr. Roe's responsibilities and the mandatory deadline for completion of the pipeline, Max Roe could not be spared, even for a few days, until the project was completed late in December. The appellants proffered an unverified letter to this effect from Mr. Roe's employer, but the chancellor declined to admit it into evidence on the basis of hearsay. The motion was denied as being untimely.

We agree since the appellants had 60 days advance notice of the trial date, yet waited until eight days from trial to file their motion. We also note the appellants made no proffer, either in their motion or at the pre-trial hearing, of what Mr. Roe's testimony would be other than a general statement that it was important to a determination of the partnership interests. *See Bolden* v. *Carter*, 269 Ark. 391, 602 S.W.2d 640 (1980); *Bone* v. *Bone*, 12 Ark. App. 163, 671 S.W.2d 217 (1984). Lastly, as the appellees point out, Dan Roe testified at length as to what he and Max agreed upon in determining their respective interests in the partnership, and it is doubtful Max Roe's testimony would have added anything in this regard.

Under these circumstances, we cannot say the trial court abused its discretion in denying the continuance.

## II. DISQUALIFICATION

The appellants next contend the chancellor erred in refusing to recuse from the case since he presided over the previous litigation involving the dissolution of the Buena Vista Farms partnership. The chancellor ruled the motion was untimely, without merit, and that the case was properly assumed under his jurisdiction as it was simply an extension of the first lawsuit by way of a postjudgment collection proceeding.

■ The decision to disqualify from a case is, again, discretionary with the trial court. *See Sloss* v. *Farmers Bank & Trust Co.*, 290 Ark. 304, 719 S.W.2d 273 (1986). That discretion should be exercised in light of the Arkansas Code of Judicial Conduct. Canon 3.C.(1) provides that a judge should disqualify himself in a proceeding where his impartiality "might reasonably be questioned, including. . .instances where he has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."

■ We have held that this section of the code is not meant to preclude participation of a judge who has obtained knowledge of a case through previous judicial participation in it. *Holloway* v. *State*, 293 Ark. 438, 738 S.W.2d 796 (1987). In *Holloway*, we held that recusal was not required of a judge who earlier approved a search warrant and later had to rule on the validity of the warrant in a pretrial suppression hearing. Although we are not entirely persuaded that this case was a mere extension of the earlier case in the nature of a "post judgment collection proceeding," as ruled by the chancellor, the same principle applies, and we will not impute improper personal knowledge to Judge Gunter simply because of his earlier participation in the first trial. Moreover, aside from pointing to various adverse rulings, the appellants have cited no evidence from the record where Judge Gunter exhibited personal bias or prejudice. We find no abuse of discretion in the chancellor's refusal to disqualify.

### III. DETERMINATION OF INTERESTS AND DISMISSAL

For their third point of error, the appellants argue it was improper for the trial court to have gone beyond setting aside the conveyance of MDR Enterprises property to determine Max and Dan Roe's respective interests in that property. They assert this determination was not requested in the pleadings and properly falls under the jurisdiction of the bankruptcy court. It is further argued the chancellor erred in refusing to dismiss Max Roe from the lawsuit as he had satisfied the judgment against him before the filing of the petition to set aside the conveyance. We disagree with both contentions.

■ In their amended petition, the appellees alleged that both the real estate transaction and the dissolution agreement

were attempts by Max and Dan Roe to defraud the appellees. They prayed that both transfers be set aside and an undivided one-half interest in the partnership property be revested in Dan Roe, subject to the administration of the bankruptcy trustee. Having conceded Max Roe's satisfaction of the judgment against him prior to the filing of their petition, the appellees sought only Dan Roe's interest in the partnership. The fact that Max Roe's judgment had been satisfied, however, did not warrant his dismissal from the case. He executed, along with Dan Roe, both the warranty deed to Otho and Marie Roe and the agreement to dissolve the MDR partnership and was, therefore, properly made a party to the lawsuit.

██ As to the pleadings, although the appellees did not specifically request a determination of Max and Dan Roe's respective interests in the MDR partnership, the original petition and its amendment requested that both transactions be annulled and that Dan Roe's interest be returned to him, subject thereafter to the jurisdiction of the bankruptcy trustee. This necessarily required a finding of exactly what percentage of the partnership capital and property constituted Dan Roe's interest and was properly considered. A court of equity can fashion the relief justified by the proof. *Keith* v. *Barrow-Hicks Ext. Imp. Dist.*, 275 Ark. 28, 626 S.W.2d 951 (1982). Furthermore, the appellants cite no authority, either from the bankruptcy code or from case law, for their second argument that the matter should have been resolved by the bankruptcy court. Points of error unsupported by authority or convincing argument will not be considered on appeal. *McGuire* v. *Bell*, 297 Ark. 282, 761 S.W.2d 904 (1988).

## IV. DIVISION OF INTERESTS

In actually determining the property interests held by Max and Dan Roe in this MDR Enterprises partnership, the chancellor found that at the time of the conveyance to their parents, Max Roe owned 33.3% (one-third) of the partnership assets and Dan Roe owned 66.67% (two-thirds). The capital account balances, or contributions, were found to be equal. The trial court made these findings by relying on the MDR Enterprises tax returns.

The appellants argue such reliance and the chancellor's resultant findings were erroneous as the tax returns do not accurately reflect Max and Dan Roe's actual contributions and

intent with regard to their respective interests. To this end, they submitted a "summary" and various checks evidencing Max Roe's contributions to the partnership. The appellants argue the evidence shows the true capital contributions, at the time of the transfer, totalled $11,823.31 for Dan Roe and $74,394.34 for Max Roe.

The tax returns for the years 1986 through 1989 were examined at trial. The first two years show equal capital account balances. There were no recordings of capital account balances for 1988 and 1989; however, the returns for those years show a transfer of assets, reflecting an increase in Dan's ownership to 66.67% and a decrease in Max's ownership to 33.3%. Dan Roe admitted the returns reflected such a change but stated it was his understanding he and Max could show a disproportionate share of income and losses for deduction purposes, without affecting ownership. Dan Roe admitted he had made no contributions after 1987 and that the evidence he submitted showed five contributions by Max Roe after 1987, totalling approximately $7,000.

We note the record reflects there was no written agreement evidencing the respective contributions of the partners when MDR Enterprises was formed, nor a general partnership agreement as such. As a result, the chancellor was required to make this determination, and any subsequent change in ownership of assets, from the dissolution agreement, the tax returns, and Dan Roe's testimony and proffered exhibits, namely the summary of Max Roe's contributions and various checks.

The tax returns were prepared at the direction of Dan and Max Roe with information they supplied their accountant and were signed by Dan Roe under penalty of perjury. They reflect an entirely different arrangement as to the partnership interests from that represented in the dissolution agreement and by Dan Roe at trial. The chancellor is in a superior position to evaluate the credibility of witnesses, *Lytle* v. *Lytle*, 301 Ark. 61, 781 S.W.2d 476 (1989), and is not bound to accept the testimony of a witness as true where a reasonable inference contrary to his testimony could have been drawn from the facts stated or from other facts and circumstances shown by the evidence unfavorable to his conclusion. *Eudora Lumber Co.* v. *Neal*, 263 Ark. 40, 562 S.W.2d 294 (1978). In this light, we cannot say the chancellor's

findings were clearly erroneous. *See Clark* v. *Bank of Bentonville*, 308 Ark. 241, 824 S.W.2d 358 (1992).

For the foregoing reasons, we affirm.